# United States District Court
### EASTERN DISTRICT OF TEXAS
#### SHERMAN DIVISION

| UNITED STATES OF AMERICA | § | |
|---|---|---|
| | § | |
| vs. | § | Case No. 4:12cr70 |
| | § | (Judge Crone/Judge Mazzant) |
| JERRY DEE STAPLETON | § | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This matter having been referred by the Honorable Marcia A. Crone, the Court has considered Defendant Jerry Stapleton's Motion to Suppress Statements and Evidence (Dkt. #17). After considering the evidence presented and the arguments of counsel at the September 27, 2012 hearing, the Court finds that the motion (Dkt. #17) should be DENIED.

Defendant Jerry Stapleton is charged in this matter with being a felon in possession of a firearm in violation of 18 U.S.C. Section 922(g)(1). In his motion to suppress, Defendant seeks to suppress the evidence discovered during the September 27, 2011 execution of arrest warrants for Defendant at a residence where Defendant was staying in Trenton, Texas. The felony arrest warrants were for charges of aggravated assault with a deadly weapon, bail jumping, and failure to appear. While executing the warrants, law enforcement officers found a .22 caliber gun and nine rounds of .22 caliber ammunition.

The Government alleges that the handgun and ammunition were found in plain view during a lawful protective sweep of the residence. Defendant claims the evidence was the result of an unlawful search. Defendant contends that the search was excessive and unjustified.

### EVIDENCE PRESENTED

At the hearing, the Court heard testimony of Grayson County Deputies Adam Bradshaw and

William May and United States Deputy Marshals Jack Bass, David Ramirez and Dustin Williams. The Court also heard testimony from Defendant's wife, Djiuna Stapleton (née Myers). The Government's witnesses relayed a version of events that differs from the version provided by Mrs. Stapleton.

The testimony of the Government's witnesses established the following uncontested facts: On September 27, 2011, Grayson County Deputies Bradshaw and May received a tip from a confidential informant notifying them that Defendant was located at a residence in Trenton, Texas.[1] At that time, Defendant had three outstanding warrants for the crimes of aggravated assault with a deadly weapon, bail jumping, and failure to appear. Upon receipt of the information, Deputy Bradshaw performed surveillance on the residence and saw Defendant's vehicle parked outside. Deputy Bradshaw contacted the U.S. Marshals Service and informed them that Defendant had been identified in a house in Trenton, Texas, and requested additional support in serving the warrants and apprehending Defendant. The U.S. Marshals met Deputies Bradshaw and May. The U.S. Marshals who testified at the hearing were all members of the East Texas Fugitive Task Force at that time.[2] Deputy Bradshaw briefed the team on Defendant's criminal history, which included arrests and/or convictions for some violent crimes, and showed a photograph of Defendant. Due to Defendant's criminal history and the nature of the arrest warrants, the officers were all in protective gear and some officers carried assault rifles. The officers then proceeded to the residence where Defendant was believed to be. No deputies went to the residence with the intention of investigating the

---

[1] The residence had two addresses, but it was confirmed at the hearing that both addresses referred to the same residence. Those addresses were 1237 FM 814, Trenton, Texas, and 304 Pearl, Trenton, Texas.

[2] The East Texas Fugitive Task Force members had several duties, including apprehending fugitives and assisting local law enforcement officers.

2

underlying charges on the warrants.

Deputy Bradshaw testified that upon arriving at the residence, he approached the front door and knocked for several minutes. There was no response. After several minutes, Defendant came to the door and Deputy Bradshaw was able to identify him. Deputy Bradshaw immediately guided Defendant into the living room, placed him on the floor just inside the door and handcuffed him. Deputy Bradshaw stated that he did not take Defendant outside to make the arrest, in part, because Defendant's leg was in a cast and it was safer to guide him inside. After handcuffing Defendant, Deputy Bradshaw placed him in a chair, searched him to make sure he did not have any weapons on his person, confirmed the arrest for the warrants, and escorted Defendant to the car and to jail.

Deputy Marshal Jack Bass is a U.S. Marshal who also testified at the hearing. As an initial matter, Deputy Bass testified that while he tries to treat all apprehensions the same, he was more alert with respect to Defendant because the arrest warrants included violent crimes. Upon arriving at Defendant's residence, Deputy Bass went to the front door with Deputies Bradshaw and Ramirez. One of the deputies knocked on the door for approximately five to six minutes, during which time no one came to the door. Deputy Bass then noticed an open window with a sheet hanging in front of it. He yanked the sheet down and saw a white female lying in a bed.[3] Upon seeing Mrs. Stapleton, he asked to see her hands. Deputy Williams came to assist Deputy Bass. Deputy Bass maintained his position at the window, communicating with Mrs. Stapleton, ensuring her hands were visible and that she did not have a weapon. While covering the window, Bass heard commotion at the front door and realized Defendant had come to the door and had been apprehended.

---

[3] The female was later identified as Djiuna Myers. She is now Djiuna Stapleton and will be referred to as "Mrs. Stapleton" hereafter. Despite being identified as Mrs. Stapleton in the Court's recitation of the facts, her identity was not known when the officers entered the house.

3

Deputy Bass then entered the house. The house was less than 1000 square feet. The bedroom where Mrs. Stapleton was located was immediately adjacent to the living room where Defendant had been apprehended. Therefore, Deputy Bass concluded an attack could have been launched from the bedroom. Because of this conclusion and the fact that an unidentified person was in the bedroom, Deputy Bass performed a protective sweep of the bedroom, searching for weapons in plain sight and looking for any place someone could have been hiding, such as under the bed and behind the door. Deputy Bass testified that while in the bedroom, another officer saw a .22 caliber shell casing in plain view and that shortly thereafter Mrs. Stapleton indicated there was a weapon under the mattress of the bed and the firearm was discovered. After Defendant was taken out of the house and escorted to jail, Deputy Bass and the other Deputy Marshals remained to ensure that Mrs. Stapleton did not have any outstanding warrants.[4]

William May testified he had been a Grayson County Sheriff's Deputy for almost five years and a member of the East Texas Task Force for almost two years, including on September 27, 2011. Deputy May approached the front porch with Deputy Bradshaw, who knocked and announced their presence. After several minutes, Defendant came to the door. Deputy May testified that they did not arrest Defendant immediately at the door to avoid creating a bottleneck at the entrance. A bottleneck would create a situation where no one would be able to enter the house. Because of this, he was trained to take suspects inside the residence to make an arrest. Deputy May tesitifed that a bottleneck might also be avoided if a suspect is arrested outside of a residence and in the yard, but doing so would not be consistent with his training.

---

[4] Defendant was apprehended and escorted outside of the house within six to seven minutes of the officers entering the house.

At the time Defendant came to the door, Deputy May noticed Deputy Williams telling someone inside the house to come to the door. Deputy May later learned Deputy Williams was talking to Mrs. Stapleton. Mrs. Stapleton did not identify herself by name at that time and made no indication that she was Defendant's wife, girlfriend, or otherwise. Deputy May entered the house and smelled recently burnt marijuana. Upon entering, Deputy May performed a protective sweep, pursuant to his training, in order to ensure there were no unknown threats in the house. Deputy May's protective sweep was performed simultaneously with other officers taking Defendant into custody. Deputy May testified that a protective sweep only involves looking where another person could be and does not involve opening up things, looking through coffee table drawers or lifting up mattresses. During his protective sweep, Deputy May searched another room and the kitchen and did not find anyone else there. He knew at least one other person was in the house but was not certain who it was or the person's gender. Deputy May testified that the house was very small, and as such it took only about 15-20 seconds to perform the protective sweep. Deputy May testified that he saw the other officers apprehend Defendant by detaining him, setting him on the ground and handcuffing him. The apprehension occurred about five feet into the doorway.

Deputy May testified that the bedroom where Mrs. Stapleton was located was approximately ten feet away from where Defendant was taken into custody. Deputy May went into the bedroom as part of his sweep and encountered Mrs. Stapleton with Deputies Ramirez and Williams. Mrs. Stapleton never presented herself in the living room or at the front door. Deputy May remained at the residence for approximately 30-45 minutes in order to collect evidence of what he perceived to be other crimes involving the seized evidence. Deputy May wrote a report regarding the incident. Such a report is generally only completed when he finds another crime or evidence of another crime.

It is not routinely done when he only executes an arrest warrant.

Deputy Marshal David Ramirez also testified. Deputy Ramirez works for the U.S. Marshals Service. Deputy Ramirez executes approximately 30-40 warrants each month and participated in Defendant's arrest on September 27, 2011.

Deputy Ramirez approached the front of the residence and knocked and announced numerous times without response from anyone in the house. Deputy Ramirez testified that another officer noticed someone through the window and that the other officer was telling someone to show his or her hands and open the front door. Defendant then answered the door. The officers instructed Defendant to get onto the ground. Deputy Ramirez testified that because the house was small, Defendant was taken into custody inside. All rooms in the residence were close in proximity. The bedroom was adjacent to the living room, and Defendant was taken into custody no more than five feet from the bedroom door.

Upon entering the residence, Deputy Ramirez's role was to ensure the integrity of the arrest and the safety of the house. Because Deputy Ramirez knew there was at least one other person in the house, he performed a protective sweep. The protective sweep was not performed to look for evidence, and it took no more than two minutes.

Deputy Ramirez encountered Mrs. Stapleton in the bedroom. The bedroom was very small -- at most 10 feet by 15 feet. It had a small amount of furniture -- a queen bed and a dresser -- and barely enough room to walk. Deputy Ramirez remained in the bedroom as Deputy Williams spoke to Mrs. Stapleton. It was at that time Deputy Ramirez noticed what looked like a .22 caliber round in plain view. He did not have to move or displace any objects to see the ammunition. He then asked Mrs. Stapleton if the ammunition was hers and if there were firearms in the house. Deputy

Ramirez testified that Mrs. Stapleton told him there was a firearm between the mattresses and indicated with her hand where it was located. At that point, Deputy Ramirez looked down and saw the butt of the gun, sticking out in plain view. He did not have to move the mattresses, or anything, to see it. He then pulled out the firearm, secured it, and gave it to the lead investigator.

Deputy Marshal Dustin Williams then testified. Deputy Williams has been a U.S. Marshal since 2001. Deputy Williams approached the residence with other team members and initially went to the rear of the residence where he could hear the knock and announce. Deputy Williams heard other officers talking through the front window with a female, so he approached the window and saw her on the bed inside.[5] Deputy Williams stayed to cover Mrs. Stapleton through the window as Deputy Bass went to the front door. Deputy Williams kept his weapon drawn and pointed through the window and maintained a clear view of Mrs. Stapleton. Another officer came into the bedroom, and Deputy Williams then entered the residence.

Deputy Williams immediately noticed a smell of burnt marijuana when he entered the residence. He also noticed Defendant was on the floor approximately five feet from both the front door and the bedroom door. Deputy Williams testified that it was consistent with officer training to make the arrest inside a residence, because it is safer to take control of the residence and know who or what is inside rather than remain outside with unknown threats in the residence. He further testified that a threat existed in the house because at least one unidentified person was inside. Upon entering the residence, Deputy Williams went straight to the bedroom and began to speak with Mrs. Stapleton.

Mrs. Stapleton told Deputy Williams that she had identification in her purse, which was in

---

[5] Deputy Williams later learned the female was Mrs. Stapleton.

the living room. Deputy Williams went to get the purse. During this time, Deputy Williams did not see the ammunition but did hear Mrs. Stapleton say there was a firearm in the residence. He saw her indicate where it was and heard her state that it was Defendant's. Mrs. Stapleton identified herself as a felon but did not identify herself as Defendant's wife or girlfriend. She stated that they were friends and had been working together earlier in the day. An officer did a record check on Mrs. Stapleton to see if there were any outstanding warrants. Once they had confirmation that there were no outstanding warrants, she was not taken into custody.

Defendant presented one witness, Mrs. Stapleton, who was present at the time of Defendant's arrest on September 27, 2011. Mrs. Stapleton was not married to Defendant at the time of his arrest. They were married on November 18, 2011. Mrs. Stapleton's testimony differed from that of the Government's witnesses in several regards.

According to Mrs. Stapleton, she and Defendant arrived at Defendant's house sometime between noon and 2:00 pm and ate lunch, took a shower, and went to bed. She testified that the house had air conditioning and therefore the windows were closed and locked. She heard someone knocking on the door, which woke them up. Mrs. Stapleton testified that they thought it was Defendant's cousin with whom Defendant had argued earlier in the day and because Defendant did not want to continue arguing, he did not answer the door. She said they heard another knock, on the back door, and then noises of a car door shutting and a car leaving. Several minutes later they heard loud and aggressive knocks on the door. At that time, Defendant got up, got dressed, and went toward the front door. As he left the room, Mrs. Stapleton went to the hallway to get a shirt. She testified that when she was standing in the hallway, she heard the window snap off and the curtain being pulled away. She testified that the house was dark because the air conditioner had not been

working well and they were trying to keep it cool.

Once the window was opened and curtain moved away, Mrs. Stapleton saw two officers. They told her not to move and to hold up her hands. She grabbed a shirt, as she had on only a bra. The officers instructed her to walk toward them. Mrs. Stapleton also saw officers handcuff Defendant immediately inside the doorway of the house and then move him to the chair. Mrs. Stapleton testified that she was standing at the foot of the bed and asked if she could put her shirt on, which they permitted. Another officer came into the room and asked if she had any identification. She told him it was in the living room. Mrs. Stapleton testified that she took out her identification and she found a sack of marijuana, which she gave to him.[6] She said that the officer then sat her in a chair and began looking around.

While the officers were looking around, she said another officer asked if there were weapons. Mrs. Stapleton's testimony was that she responded that she did not know, at which point the officer pulled back the sheets and saw the weapon. She said another officer looked in the closet and discovered shotgun shells. He asked her where the shotgun shells came from and she said she did not know. Mrs. Stapleton testified that she never made a statement that the firearm was Defendant's, never told the officers that there was a firearm in the room, did not indicate in any manner there was a firearm in the room, and did not even know that there was a firearm in the room. She stated that no more than five minutes passed between when the officers came into the room and when they found the firearm.

---

[6] The Court now notes that there was a significant amount of testimony from the Government's witnesses surrounding the discovery of marijuana and marijuana pipes in the residence. Because the indictment and the motion to suppress relate to only the firearm and ammunition found in the residence, the Court does not find that the testimony regarding the marijuana or pipes is relevant.

In addition to conflicting with the Government's witnesses' testimony, Mrs. Stapleton's testimony is somewhat self-conflicting. She testified that the house had air conditioning and therefore the window was not open. Mrs. Stapleton then later testified that the air conditioner was not working well. There also was some discrepancy regarding whether the curtain on the window could have been pulled down if in fact the window was initially closed, as Mrs. Stapleton testified. The Court addresses these discrepancies below.

**ANALYSIS**

Defendant argues that because the arrest occurred at the front door, there was no need for a protective sweep of the entire residence. Defendant further argues that the scope of the protective sweep was excessive and constituted a full search of the residence without a search warrant. The Government argues that the protective sweep was justified and that the evidence was lawfully seized under the plain view doctrine.

Because an arrest warrant is founded on probable cause, it implicitly carries with it the authority to enter a residence in which a suspect lives as long as there is a reasonable belief the suspect is inside. *Payton v. New York*, 445 U.S. 573, 603 (1980). An arrest may also be accompanied by a "protective sweep." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). A protective sweep is "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Id.*; *United States v. Rodriguez*, 601 F.3d 402, 405 (5th Cir. 2010) ("The protective sweep doctrine allows government agents, without a warrant, to conduct a quick and limited search of premises for the safety of the agents and others present at the scene."). To be constitutionally valid, a protective sweep must meet a four prong test: (1) the police must not have entered (or remained in) the residence illegally and their presence must be for a legitimate law

enforcement purpose; (2) the protective sweep must be supported by a reasonable, articulable suspicion that the area to be swept harbors an individual posing a danger to those on the scene; (3) the legitimate protective sweep may not be a full search but rather must be no more than a cursory inspection of those spaces where a person may be found; and (4) the protective sweep may last no longer than is necessary to dispel the reasonable suspicion of danger, and no longer than the police are justified in remaining on the premises. *Rodriguez*, 601 F.3d at 405-06. The court should consider the totality of the circumstances surrounding the officers' actions to determine whether an officer had a reasonable, articulable suspicion sufficient to justify a protective sweep. *Id.*

Here, law enforcement officials had an arrest warrant for Defendant and had reason to believe Defendant was inside the residence. As such, the entry into the house was warranted. *Payton*, 445 U.S. at 603. Moreover, the uncontested testimony indicates that Defendant was extremely slow to answer to the door, the house contained at least one unidentified person, Defendant had a violent criminal past and an outstanding arrest warrant for a violent crime, the bedroom and all rooms searched were adjacent to the living room where Defendant was apprehended, and the house smelled of burnt marijuana when the officers entered. Courts have found protective sweeps to be warranted under similar circumstances. *See, e.g., United States v. Waldrop*, 404 F.3d 365, 369 (5th Cir. 2005) (finding a protective sweep warranted when the defendant was a member of a violent organization, had made threats regarding police officers and there were other individuals in the house when police executed the search warrant); *United States v. Thomas*, 429 F.3d 282, 287-88 (Fed. Cir. 2005) (finding that in an apartment where all rooms immediately adjoined the place of arrest, all rooms constituted a space from which an attack could be immediately launched and therefore the residence in its entirety was subject to a protective sweep); *United States v. Charles*, 469 F.3d 402, 405-06 (5th

11

Cir. 2006) (holding that an officer's sweep of a storage unit immediately adjacent to the site of the arrest was permissible when officer's reason for the protective sweep was to ensure no other person was hiding in, under, or around the car located in the storage unit).

A closer analysis also reveals that all four prongs of the protective sweep test are met: (1) the law enforcement officers entered the residence for a legitimate law enforcement purpose pursuant to the arrest warrant; (2) the protective sweep was supported by a reasonable, articulable suspicion that the area harbored an individual who could pose a danger to the officers - the presence of at least one unidentified individual and the knowledge that Defendant had a violent criminal history; (3) the protective sweep was limited to the inspection of those rooms and areas in the house where an individual may have been found; and (4) although the law enforcement testimony varied on the length of time the protective sweep took, it lasted no more than two minutes. Such an amount of time indicates it lasted only as long as was necessary to dispel the reasonable suspicion of danger, and no longer than the police were justified in remaining on the premises.[7] As such, the Court concludes that the protective sweep was warranted and did not exceed its legal scope.[8] The Court must now determine whether the evidence, namely the .22 caliber firearm and ammunition, was legally seized.

The plain view doctrine will justify a seizure of evidence if (1) the officers lawfully entered the area (2) where items could be plainly viewed; (3) the incriminating nature of the evidence was

---

[7] To the extent Defendant contends that the protective sweep was excessive as he could have been arrested outside of his home, the fact remains that he was arrested in his living room and the officers were justified in making the arrest inside the home pursuant to their training. As such, the officers had to take the limited precautionary measure of a protective sweep. *See United States v. Thomas*, 429 F.3d 282, 287-88 (Fed. Cir. 2005).

[8] Because the Court concludes that the protective sweep was proper, it will not address whether it was a valid protective search incident to arrest.

immediately apparent; and (4) the officers had a lawful right to access the items. *Horton v. California*, 496 U.S. 128, 136-37 (1990); *Waldrop*, 404 F.3d at 369. As discussed above, the officers lawfully entered the house and performed a protective sweep and, as such, the first prong of the plain view doctrine has been met. "The incriminating nature of an item is 'immediately apparent' if the officers have 'probable cause' to believe that the item is ... evidence of a crime or contraband." *Waldrop*, 404 F.3d at 369. The Court finds that because Defendant was a known felon, the incriminating nature of the firearm was immediately apparent and, as such, the third prong of the plain view test is met. *See id.* at 370; 18 U.S.C. § 922(g)(1). The Court must now address the remaining prongs of the plain view doctrine.

There is no dispute that there was ammunition in plain view of the officers. Testimony is conflicting, however, with respect to the discovery and location of the firearm. The Government's witnesses all testified that Deputy Ramirez asked Mrs. Stapleton if there was a firearm in the house and that she responded in the affirmative and indicated where the firearm was located. Further, Deputy Ramirez testified that the weapon was in plain view, with the butt sticking out of the mattress. Mrs. Stapleton, however, testified that when asked if there was a firearm in the house, she said she did not know and at that point, an officer pulled back the sheets and saw the weapon. She further testified that she never made a statement that the firearm was Defendant's, never told the officers that there was a firearm in the room, did not indicate in any manner there was a firearm in the room, and did not even know that there was a firearm in the room. Due to the internally inconsistent nature of Mrs. Stapleton's testimony, however, and the consistency of the testimony from the five witnesses presented by the Government, the Court finds the Government's version of

facts to be more credible.[9]

Taking the officers' testimony as true, the Court finds that the evidence was legally seized pursuant to the plain view doctrine. As an initial matter, the firearm was identified by Mrs. Stapleton and was found in plain view, with the butt of the gun protruding from the mattress. Moreover, the inevitable discovery doctrine also would have led to the discovery of the evidence. *See United States v. Jackson*, 596 F.3d 236, 240-42 (5th Cir. 2010). Officers were lawfully in Defendant's residence, executing a federal arrest warrant, and once there smelled burnt marijuana and saw a .22 caliber bullet in plain view. The Court believes that the officers could have secured a search warrant and conducted a search to discover the disputed evidence, had they felt it necessary. For these reasons, the evidence was lawfully seized.[10] *See id.* at 242.

## RECOMMENDATION

Having considered all of the evidence presented, the Court finds that the officers properly entered the house and performed a lawful protective sweep, which led to the discovery of the .22 caliber firearm and statements allegedly made by Mrs. Stapleton. As such, the Court finds that Defendant's motion to suppress should be DENIED.

Within fourteen (14) days after service of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C.A. § 636(b)(1)(c).

---

[9] While not expressly considering it, the Court also notes the fact that both Defendant and Mrs. Stapleton are convicted felons. *See U.S. v. Anderson*, 78 Fed. Appx. 954, 2003 WL 22426863, at * 1 (5th Cir. 2003).

[10] The Government also puts forth the "plain smell" doctrine, arguing that the smell of burnt marijuana can create probable cause to conduct a search in connection with the investigation of criminal conduct. The cases cited by the Government all involve drug-related searches. While this distinction does not alone negate the application of the "plain smell" doctrine, because the Court finds that the evidence was lawfully seized under the plain view and inevitable discovery doctrines, it will not address whether the "plain smell" doctrine applies.

Failure to file written objections to the proposed findings and recommendations contained in this report within the time period set forth above shall bar an aggrieved party from de novo review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court except on grounds of plain error or manifest injustice. *Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th Cir. 1988).

**SIGNED this 12th day of October, 2012.**

_____
AMOS L. MAZZANT
UNITED STATES MAGISTRATE JUDGE